# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

NANCY L. BODDICKER,

      Plaintiff,

vs.

AMERICAN HONDA MOTOR CO.,
INC.,

      Defendant.

No. C10-1018

ORDER

## TABLE OF CONTENTS

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  **RELEVANT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.    *Plaintiff's Riding Experience and Skill* . . . . . . . . . . . . . . . . . . . 3
    B.    *Plaintiff's Purchase and Maintenance of the Motorcycle* . . . . . . . . 4
    C.    *First Accident* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    D.    *Second Accident* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    E.    *Post-Accident Inspections* . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        1.    *Jim Hofland* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            a.    *Background* . . . . . . . . . . . . . . . . . . . . . . . 8
            b.    *Inspection* . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.    *James Weaver* . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            a.    *Background* . . . . . . . . . . . . . . . . . . . . . . . 9
            b.    *First Inspection and First Report* . . . . . . . . . . . 10
            c.    *Second Inspection and Supplemental Report* . . . . . . 12
        3.    *Charles Buse* . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            a.    *Background* . . . . . . . . . . . . . . . . . . . . . . . 13
            b.    *Inspection and Report* . . . . . . . . . . . . . . . . . 13

IV.  **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    A.    *Motion in Limine to Exclude Expert Testimony* . . . . . . . . . . . . . 15

|   |   | 1. | *Is Weaver Qualified as an Expert Witness?* | 16 |
|   |   | 2. | *Is Weaver's Opinion Testimony Reliable?* | 17 |
|   | **B.** | | **Motion for Summary Judgment** | 21 |
|   |   | 1. | **Relevant Facts** | 21 |
|   |   | 2. | **Legal Standard to be Applied** | 23 |
|   |   | 3. | **Analysis** | 24 |
|   |   |   | a.   *Is There a Genuine Issue Regarding Whether the Clutch was Defectively Manufactured?* | 24 |
|   |   |   | b.   *Is There a Genuine Issue Regarding Whether the Alleged Defect was a Proximate Cause of the Accident?* | 25 |
|   |   |   | c.   *Are Boddicker's Breach of Warranty Claims Duplicative of Her Manufacturing Defect Claim?* | 27 |
| **V.** | **ORDER** | | | 30 |

## I. INTRODUCTION

This matter comes before the Court on the Motion *in Limine* to Exclude Testimony of Plaintiff's Expert Witness James Weaver (docket number 32) filed by Defendant American Honda Motor Co., Inc. on July 1, 2011; the Resistance (docket number 34) filed by the Plaintiff on July 15, 2011; and the Reply (docket number 37) filed on July 22, 2011.

Also coming before the Court at this time is the Motion for Summary Judgment (docket number 33) filed by Defendant American Honda Motor Co., Inc. on July 1, 2011; the Resistance (docket number 38) filed by the Plaintiff on July 25, 2011; and the Reply (docket number 39) filed on July 25, 2011.[1]

## II. PROCEDURAL HISTORY

On June 10, 2010, Plaintiff Nancy L. Boddicker filed this action in the Iowa District Court for Clayton County, seeking damages for injuries sustained in a motorcycle accident. On July 28, 2010, Defendant Honda North America, Inc. removed the action to this court.

---

[1] On August 1, 2011, Defendant filed a Supplemental Appendix (docket number 41) and a Response to Plaintiff's Statement of Additional Material Facts (docket number 42).

On September 29, 2010, Boddicker filed an amended petition, adding American Honda Motor Company, Inc. as a defendant  On October 19, 2010, Defendants filed an answer. On March 24, 2011, the parties stipulated to the dismissal of Honda North America, Inc. from the action.  On July 1, 2011, American Honda Motor Company, Inc. ("Honda") timely filed a Motion *in Limine* and Motion for Summary Judgment, which are pending before the court.  Trial is scheduled for December 12, 2011.

## III.  RELEVANT FACTS

This lawsuit arises from a motorcycle accident on October 11, 2008, in which Boddicker sustained multiple injuries and damage to her 2007 Honda VT750 Shadow motorcycle.[2]  Boddicker claims that while she was negotiating a right-hand curve, she attempted to slow the motorcycle down by engaging the clutch, the clutch failed to engage, and this failure caused her to lose control of her motorcycle and crash into an oncoming car.[3]  Boddicker further claims that this clutch failure was a defect that existed at the time of the motorcycle's sale or distribution.[4]

### A.  Plaintiff's Riding Experience and Skill

Boddicker began riding motorcycles in August 2007 after completing a weekend skill-training course at Kirkwood Community College.[5]  According to Boddicker, her rider-training course taught her that downshifting when entering curves was a proper way to decrease speed.[6]  Boddicker rode her motorcycle for approximately 1,400 miles without an accident.[7]

---

[2] *See* Plaintiff's Amended Petition at Law at 2; Defendant's App. at 6.

[3] *Id.*

[4] *Id.* at 4; Defendant's App. at 8.

[5] *See* Deposition of Nancy Boddicker.  Defendant's App. at 15.

[6] *Id.*; Defendant's App. at 29.

[7] *Id.*; Defendant's App. at 18.

Honda claims Boddicker demonstrated during her deposition a lack of understanding of basic motorcycle mechanics.[8]  Boddicker was unsure of the number of gears on her motorcycle.[9]  Additionally, Honda points to the fact that Boddicker initially believed her motorcycle had a reverse gear and then said it did not have a reverse gear.[10]  Furthermore, Honda claims that Boddicker did not know how to properly operate motorcycles.[11]  Honda points to Boddicker's admission that she initially thought the clutch problems were due to her "being a newer driver."[12]  After this accident, Boddicker purchased a second bike and has ridden this motorcycle for approximately two or three thousand miles without an accident.[13]  Additionally, Boddicker has not experienced problems with her second bike's clutch.[14]

### B. Plaintiff's Purchase and Maintenance of the Motorcycle

Boddicker purchased the motorcycle involved in this accident from McGrath Motorsports, L.L.C. ("McGrath"), an authorized Honda dealer, on July 21, 2007.[15]  Defendant American Honda Motor Company, Inc. is the exclusive distributor of Honda products within the United States, and distributed the motorcycle to McGrath before it was

---

[8] *See* Defendant's Memorandum in Support of Motion for Summary Judgment (docket number 33-1) at 2.

[9] *See* Deposition of Nancy Boddicker.  Defendant's App. at 25-26.

[10] *Id.*; Defendant's App. at 26.

[11] *Id.*; Defendant's App. at 21.  Boddicker testified that "when I pulled up to a stoplight or stop sign and I would go to take off and it would die.  The shifter, you put it in first gear, and you come to the stop and you are ready to take off, and it would die on me.  It was like I swear I had it in there, but when I took off it wasn't there."

[12] *Id.*; Defendant's App. at 19.

[13] *Id.*; Plaintiff's App. at 23.

[14] *Id.*; Plaintiff's App. at 30.

[15] *See* Plaintiff's Answer to Interrogatory 4; Defendant's App. at 36.

sold to Boddicker.[16] According to Honda's On-Road Motorcycle Set-up and Pre-delivery Checklist completed by McGrath, the motorcycle's clutch had properly adjusted free play and its proper operation was checked and confirmed before sale to Boddicker.[17]

Boddicker claims she often had difficulty downshifting and mentioned this to her friend, Jim Hofland, prior to the accident.[18] However, Boddicker told James Weaver that she never adjusted or had someone else adjust the clutch according to her motorcycle's maintenance manual.[19] The motorcycle's manual recommended that owners do monthly periodic maintenance and a checkup of the motorcycle's clutch.[20] Since its purchase, Boddicker serviced her motorcycle with McGrath only once. She did not report any clutch issues to McGrath then or at any other time.[21]

### C. First Accident

Boddicker experienced two accidents on October 11, 2008, with the second accident resulting in this lawsuit. Concerning the first accident, Boddicker approached a right-hand curve going 40 or 45 mph.[22] She attempted to slow the motorcycle by downshifting.[23] The gear "did not hit" and Boddicker could not slow the bike down.[24] As a result, Boddicker could not complete the turn, left the roadway, and came to rest in a ditch in

---

[16] *See* Defendant's Answer (docket number 16) at 5.

[17] *See* On-Road Motorcycle Set-up and Pre-delivery Checklist; Defendant's App. at 170.

[18] *See* Deposition of Nancy Boddicker. Plaintiff's App. at 20.

[19] *See* First Report of James Weaver; Defendant's App. at 142.

[20] *See* 2007 Shadow Spirit 750 Owner's Manual; Defendant's App. at 41-47.

[21] *See* Deposition of Nancy Boddicker; Defendant's App. at 19.

[22] *Id.*; Defendant's App. at 24.

[23] *Id.*; Defendant's App. at 17.

[24] *Id.*

somebody's yard.[25]   Mr. Hofland, who already passed the turn, came back to help Boddicker.[26]   According to Hofland, Boddicker said she "couldn't find the gears."[27] Hofland warned Boddicker "when she had those kind of problems, not to look down to see what her foot is doing."[28]   When asked about the warning, Hofland opined that "rookie riders probably have a – they want to see what is going on, they are not used to feeling the pedal and knowing where you're at."[29]   However, Hofland didn't know if Boddicker had been looking down at her leg at any time while riding.[30]

### D.  Second Accident

Boddicker and Hofland continued their rides after the first incident.   They approached a 55 mph right-hand curve.[31]   Hofland stated that he slowed down to around 50 mph because he knew Boddicker was shy of curves.[32]   Hofland slowed down by rolling off the throttle and not by downshifting or braking.[33]

Soon after, Boddicker approached the right hand curve.  Boddicker claims that she downshifted before going into the curve to slow the motorcycle, but does not remember what happened after that.[34]   However, Boddicker's expert witness, James Weaver, testified that Boddicker told him "she was having difficulty with the motorcycle and looked

---

[25] *Id.*

[26] *See* Deposition of James Hofland; Defendant's App. at 96.

[27] *Id.*

[28] *Id.*

[29] *Id.*, Defendant's App. at 96-97.

[30] *Id.*, Defendant's App. at 97.

[31] *Id.*, Defendant's App. at 82.

[32] *Id.*; Defendant's App. at 83.

[33] *Id.*

[34] *See* Deposition of Nancy Boddicker; Defendant's App. at 28.

down at the shifter area."[35]   Another witness, Kenyon Brody, the driver of an oncoming car, said he saw Boddicker's leg "jerk" repeatedly and then saw the motorcycle begin to veer to the left until it crossed the centerline and clipped his car's left rear quarter panel.[36] Brody said he saw Boddicker's front wheel wobble as the motorcycle veered to the left. Brody testified that Boddicker "jerked her leg and her foot shot out."[37]   Brody's passenger, Robbyn Brody, testified that Boddicker's knee went out, but not her foot.[38] Brody opined that Boddicker did not look like she was downshifting, but instead "trying to get her foot loose."[39]   Additionally, Brody said he thought he saw Boddicker's left boot untied while on her motorcycle, but couldn't be sure.[40]   After the collision, Boddicker and her motorcycle continued to the left side of the road.   Boddicker was found lying in the ditch and had sustained multiple injuries.[41]   Robbyn Brody was "convinced before that her boot was off" as Boddicker lay on the ground, but was unsure after hearing her husband say that the boot was untied.[42]

---

[35] *See* Deposition of James Weaver; Defendant's App. at 112-13.

[36] *See* Deposition of Kenyon Brody; Defendant's App. at 49-50.

[37] *Id.*; Defendant's App. at 50.

[38] *See* Deposition of Robbyn Brody; Defendant's App. at 59.

[39] *See* Deposition of Kenyon Brody; Defendant's App. at 51-52.

[40] *Id.*; Defendant's App. at 52.

[41] *See* Police Report; Defendant's App. at 11.   Boddicker was apparently not wearing a helmet.

[42] *See* Deposition of Robbyn Brody; Defendant's App. at 62.

### E.  Post-Accident Inspections

#### 1.  Jim Hofland

##### a.  Background

After the accident, Jim Hofland, Boddicker's riding companion,  purchased the wrecked motorcycle from Boddicker "to fix it up."[43]   Hofland has been riding motorcycles for a very long time and was a professional motor cross rider for three or four years.[44]  Additionally, Hofland has personally done work on his motorcycle.[45]  When asked what type of work, he responded "[e]verything and anything."[46]  Hofland testified that he has "fixed up" crashed bikes "more than once."[47]

##### b.  Inspection

After straightening the forks and removing the broken parts, Hofland took the motorcycle for a test drive.  Hofland discovered that the "clutch was slipping."[48]  Hofland adjusted the clutch according to Honda's guidelines.[49]  Hofland test rode the motorcycle and noticed that the clutch still slipped despite adjustment.[50]  Hofland opined the clutch did not get damaged during the accident because "[t]here was hardly any damage on that side."[51]   After Hofland finished his inspection, the motorcycle was delivered to Boddicker's expert, James Weaver.

--------

[43] *See* Deposition of James Hofland; Defendant's App. at 87.

[44] *Id.*; Defendant's App. at 70-71.

[45] *Id.*; Defendant's App. at 72.

[46] *Id.*

[47] *Id.*; Defendant's App. at 87.

[48] *Id.*; Defendant's App. at 88.

[49] Id.; Defendant's App. at 91.

[50] *Id.*; Defendant's App. at 92.

[51] *Id.*; Defendant's App. at 93.

## 2.   *James Weaver*

### a.   *Background*

James Weaver is employed at Hall Wade Engineering Services in Ames, Iowa, as a professional mechanical engineer and has worked there since 2008.[52]   He has a Bachelor's Degree in Mechanical Engineering from Cleveland State University and has taken 15 credits of graduate Mechanical Engineering and 14 credits of undergraduate Electrical Engineering at the University of Colorado Denver.[53]   Additionally, Weaver took an accident reconstruction course offered by the Society of Automotive Engineers.[54]   Since 1972, Weaver has worked as an air pollution, environmental, waste, and mechanical engineer at various places of employment.[55]   He is a certified professional engineer in Colorado and Iowa.[56]

Weaver describes himself as an "[e]xperienced automotive, motorcycle and marine mechanic" and "[a]ctive as motorcyclist including forensic evaluation."[57]   Weaver has ridden motorcycles since 1974 and has personally administered numerous road tests on his own motorcycles.[58]   Weaver described the road tests he administers as:

> riding the motorcycle to see if there's wobble in the steering . . . problems with braking performance with grabbing, if there's problems with the wheels out of balance, if there's play in the triple head of the forks, play in any of the wheels, problems with shifting, *with clutch slippage*, hesitation on acceleration from carburetion, cutting out at high speeds from electrical problems or fuel flow.

---

[52] *See* Resume of James Weaver; Defendant's App. at 99-100.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *See* Deposition of James Weaver; Defendant's App. at 106, 108-09.

Deposition of James Weaver; Defendant's App. at 108-109 (emphasis added).

Previously, Weaver has worked on two motorcycle accident cases. In the first case, Weaver analyzed the "visibility of the driver of the tractor attached to the grain wagon, whether he could see these motorcycles, and then what the visibility of the motorcyclist was of the tractor and grain wagon."[59] Additionally, Weaver looked at the handling and braking of the motorcycle.[60] Weaver did not testify in that case.[61] In the second case, Weaver analyzed the "instability at high speed that caused the motorcycle to oscillate and crash."[62] That case did not "go into litigation" and Weaver did not testify.[63] Additionally, Weaver has testified in an ATV accident case.[64]

### b.    First Inspection and First Report

Mr. Weaver conducted two inspections and filed two reports. Weaver's first report is based on his interview with Boddicker and his first inspection of the motorcycle. According to Weaver, Boddicker told him "she was having difficulty with the motorcycle and looked down at the shifter area."[65] Specifically, Boddicker said "the motorcycle didn't seem to shift properly," and she "looked down at her left foot to see if there was something that she had done to cause that."[66] Boddicker also told Weaver about the first

---

[59] *Id.*; Defendant's App. at 102.

[60] *Id.*; Defendant's App. at 103.

[61] *Id.*

[62] *Id.*; Defendant's App. at 104.

[63] *Id.*

[64] *Id.*; Defendant's App. at 105.

[65] *See* Deposition of James Weaver; Defendant's App. at 112-13.

[66] *Id.*; Defendant's App. at 113-14.

incident on the day of the accident, and the problems she experienced with shifting.[67] According to Weaver, however, Boddicker said she was trying to "upshift" instead "of downshift."[68]

 After discussing the accident with Boddicker, Weaver conducted his first inspection. Also present at that time were Boddicker, Hofland, Adam Bernard of Weaver's company, Chris Christensen of Honda, and Jim Joyce of McLarens Young.[69]   During the first inspection, Weaver initially "looked over" the motorcycle for about 20-25 minutes.[70] Before the inspection, Hofland told Weaver that he had adjusted the motorcycle's clutch according to Honda's factory specifications.[71]   Weaver noticed that the motorcycle's clutch was originally adjusted approximately five revolutions tighter than it should have been and this likely caused the clutch to slip.[72]   After conducting a road test, Weaver adjusted the clutch but still observed clutch slippage.[73]   In his deposition, Weaver testified "that there was inadequate or no free play at the handle and the clutch could – was not fully engaged with the handle released."[74]   In his report, Weaver excluded "riding the clutch" as a cause of clutch slippage because of the setup of the motorcycle, Boddicker's physical stature, and Boddicker's denial that she ever rode the clutch.[75]

---

[67] *Id.*; Defendant's App. at 129.

[68] *Id.*

[69] *See* Supplemental Report of James Weaver; Plaintiff's App. at 64.

[70] *See* Deposition of James Weaver; Defendant's App. at 119.

[71] *See* First Report of James Weaver; Defendant's App. at 141.

[72] *Id.*

[73] *Id.*

[74] *See* Deposition of James Weaver; Defendant's App. at 123.

[75] *See.* First Report of James Weaver; Defendant's App. at 141-42.

Weaver concluded that the clutch failing was dangerous and that this was the likely cause of Boddicker's second accident.[76] Weaver admitted during his deposition that when completing his first report, he did not consult the police report, police photographs, or other witness statements, nor did he visit the accident scene or have any specific information about the location of the accident.[77] Weaver's report was reviewed and approved by Dr. Jerry Lee Hall, Ph.D. and Registered Mechanical Engineer.[78] Dr. Hall was not present during Weaver's inspection, however, nor did he do any independent analysis on the motorcycle.[79]

### c.   Second Inspection and Supplemental Report

On March 24, 2011 – approximately nine days after being deposed regarding his opinions – Mr. Weaver participated in a second inspection of the motorcycle. Also present at the second inspection were Charles Buse, Honda's expert witness, Bob Scholke of Honda, and counsel for both parties. Buse completely disassembled the motorcycle's clutch system.[80] Weaver found the clutch to be "overheated" and "heavily worn."[81] Additionally, Weaver found premature wear of the clutch discs.[82] Weaver concluded that one of two possibilities caused this clutch system's extreme wear and tear after only 1,400 miles: a manufacturer's defect or "riding the clutch."[83] Weaver excluded riding the

---

[76] *Id.*; Defendant's App. at 142.

[77] *See* Deposition of James Weaver; Defendant's App. at 111-12.

[78] *See* First Report of James Weaver; Defendant's App. at 143.

[79] *See* Deposition of James Weaver; Defendant's App. at 110.

[80] *See* Supplemental Report of James Weaver; Plaintiff's App. at 63.

[81] *Id.*; Plaintiff's App. at 68.

[82] *Id.*; Plaintiff's App. at 70.

[83] *Id.*; Plaintiff's App. at 71.

clutch as a cause of the defect for reasons stated previously.[84] Weaver concluded that "the motorcycle most likely was sold to Ms. Boddicker with the clutch improperly adjusted."[85]

### 3. Charles Buse

#### a. Background

Honda asked Charles Buse to inspect Boddicker's motorcycle and give his opinion regarding Boddicker's accident. Buse is a professional engineer and Vice President of Safety Engineering Associates, Inc.[86] He has "extensive experience operating, testing, and examining . . . motorcycles."[87] Additionally, he has "previously been involved in numerous cases of accident analysis, defect investigation, and testing involving motorcycles."[88]

#### b. Inspection and Report

On March 25, 2011, at the facilities of Boddicker's expert, Mr. Buse completely disassembled and examined the clutch.[89] In his report dated April 14, 2011, Buse found that "[i]n the higher gears the clutch would slip badly under moderate to hard throttle application."[90] Additionally, he found that in third gear with the motorcycle stopped, the brake applied, and the clutch lever completely released, "the engine would run with the

---

[84] *Id.*

[85] *Id.*

[86] *See* Report by Charles Buse; Defendant's App. at 148-160.

[87] *Id.*; Defendant's App. at 157.

[88] *Id.*

[89] *Id.*; Defendant's App. at 153.

[90] *Id.*

clutch slipping for one to two seconds before the engine would die."[91]  Buse found "that the clutch was worn beyond usable limits."[92]

Buse concluded that the clutch cable was damaged in the accident and this "would tend to lessen or eliminate any free play present at the time of the accident (if any)."[93] He concluded "it is impossible to know exactly what the clutch cable adjustment was at the time of the accident" due to "Mr. Hofland's subsequent adjustments to the cable."[94] Additionally, he concluded that "[t]here is no evidence to support the opinion that the clutch on the motorcycle was improperly adjusted from the factory or by the dealer."[95] Buse opined instead that the most likely causes of the clutch slippage were "starting in an improper gear, excessive clutch slipping when starting, riding the clutch, or improper clutch cable free play adjustment."[96]  Finally, Buse concluded that "Ms. Boddicker's accident was not caused by a slipping clutch," but rather "by inattentiveness and inexperience on her part."[97]

## IV. DISCUSSION

Honda has filed two motions.  In its first motion (docket number 32), Honda seeks the exclusion of all of James Weaver's testimony, pursuant to FEDERAL RULES OF EVIDENCE 104(a) and 702 and the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

---

[91] *Id.*

[92] *Id.*; Defendant's App. at 158.

[93] *Id.*; Defendant's App. at 157.

[94] *Id.*

[95] *Id.*; Defendant's App. at 158.

[96] *Id.*

[97] *Id.*; Defendant's App. at 159.

In its second motion (docket number 33), Honda seeks summary judgment in its favor on Plaintiff's products liability and breach of implied warranty claims, pursuant to FEDERAL RULE OF CIVIL PROCEDURE 56.

## A. *Motion in Limine to Exclude Expert Testimony*

Honda moves this court to exclude the expert testimony of James Weaver, asserting his opinions are unreliable and thus inadmissible. The admissibility of expert testimony is governed by FEDERAL RULES OF EVIDENCE 104(a) and 702. Rule 104(a) states that "[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court." FED. R. EVID. 104(a). Rule 702 governs the admissibility of expert testimony and states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

The Court must serve as "a gatekeeper" to insure that proffered expert testimony is both relevant and reliable. *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006). The burden is on the party offering the expert testimony to prove that it is reliable. *Id.*

At the outset, the Court must determine whether the testimony is relevant; that is, whether the expert testimony will be "useful to the finder of fact in deciding the ultimate issue of fact." *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). Here, Honda appears to concede that Weaver's opinions are relevant. Second, the Court must determine whether Weaver is "qualified to assist the finder of fact." *Id.* Third, the Court must determine if the testimony is "reliable or trustworthy," applying the three enumerated

requirements of Rule 702.  *Id.*  To determine reliability, courts must consider a list of nonexclusive factors found in *Daubert* and its progeny.  These factors include:

> (1)  whether the "theory or technique" can be and has been tested;
>
> (2)  whether the theory or technique has been subjected to peer review and publication;
>
> (3)  the known or potential rate of error; and
>
> (4)  whether the theory has been generally accepted within the scientific community.

*Daubert,* 509 U.S. at 593-94.[98]

> *Daubert*'s progeny provide additional factors such as:
>
> (5)  whether the expertise was developed for litigation or naturally flowed from the expert's research;
>
> (6)  whether the proposed expert ruled out other alternative explanations; and
>
> (7)  whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

*Lauzon,* 270 F.3d at 687.

"FEDERAL RULE OF EVIDENCE 702 reflects an attempt to liberalize the rules governing the admission of expert testimony."  *Shuck v. CNH America, LLC,* 498 F.3d 868, 874 (8th Cir. 2007), (quoting *Lauzon,* 270 F.3d at 685).  "The rule clearly is one of admissibility rather than exclusion."  *Id.*

If permitted to do so, Mr. Weaver will testify that "the motorcycle was likely delivered [to Boddicker] with the clutch free-play improperly adjusted."  The relevance of the testimony is undisputed.  It must be determined, however, whether Weaver is qualified to render an opinion and whether such opinion is reliable.

### 1.  *Is Weaver Qualified as an Expert Witness?*

Honda first argues that Weaver is not qualified to render an expert opinion regarding alleged defects in a motorcycle or on accident causation.  Weaver has a degree

---

[98] The issue in *Daubert* was whether the plaintiffs' experts would be permitted to testify that a drug marketed by the defendant caused birth defects.

in mechanical engineering and has taken graduate study in the same field. He has been a licensed professional engineer since 1977. In addition, he is a motorcycle enthusiast, having ridden motorcycles since he was a teenager and owning 10 or 11 motorcycles over the years. In his resume, Weaver describes himself as an experienced motorcycle mechanic, and "[a]ctive as motorcyclist including forensic evaluation."[99] As noted by Honda, however, Weaver is not certified in accident reconstruction and has only limited experience in cases relating to motorcycle accidents.

Pursuant to Rule 702, a witness may qualify as an expert "by knowledge, skill, experience, training, or education." Here, Weaver is trained in mechanical engineering and has worked as a registered mechanical engineer for nearly 40 years. Weaver has substantial experience in operating motorcycles, having owned a substantial number of motorcycles and having ridden since he was a teenager. Weaver claims that he is an experienced motorcycle mechanic and has substantial knowledge in the operation of motorcycles. The issue is not whether Weaver is the most qualified expert on motorcycle defects or motorcycle accidents, but rather if Weaver is qualified under the criteria specified in Rule 702. The Court concludes that the combination of these factors are sufficient to meet the standard set forth in Rule 702, thereby permitting Weaver to testify regarding an opinion on the condition of Boddicker's motorcycle. Presumably, the jury will weigh Weaver's qualifications in weighing his opinions.

### 2.    Is Weaver's Opinion Testimony Reliable?

In determining whether Weaver's opinions are "reliable or trustworthy," the Court must consider the three enumerated requirements found in Rule 702 and the factors identified by *Daubert* and its progeny. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the Court extended the general principles of *Daubert* to "the testimony of engineers and other experts who are not scientists."

---

[99] *See* Resume of James Weaver; Defendant's App. at 100.

First, the Court must consider whether Weaver's testimony is based on "sufficient facts or data." Honda notes that when Weaver rendered his initial opinion, he had not reviewed all of the available information. He had inspected the motorcycle, however, with one or more representatives of Honda present.[100] After the motorcycle was inspected, it was test driven by Weaver, Jim Joyce, and Adam Bernard (a work associate of Weaver).[101] It was apparently agreed that the "slipping clutch" would have to be dismantled and more thoroughly inspected. At that time, however, Weaver had not read the police report, visited the scene, reviewed any photographs, or spoken with any witnesses.

The second inspection occurred on March 24, 2011, shortly after Weaver was deposed. Present at the second inspection were Charles Buse, Honda's expert witness, and Bob Scholke of Honda. The motorcycle was test driven by Buse, "who observed that the clutch had severe slippage."[102] The clutch was then disassembled and thoroughly inspected by both experts. Prior to rendering his final opinion, Weaver reviewed the police report, which is attached to Weaver's supplemental report.

The Court concludes that Weaver's opinions are based on "sufficient" facts and data. While Weaver's investigation of the accident could have been more thorough, the issue is not whether Weaver could have done more, but whether his investigation was

---

[100] In his first report, dated October 29, 2009, Weaver states that the inspection was conducted on June 10, 2009. *See* Defendant's App. at 140. In his supplemental report, however, dated May 5, 2011, Weaver states that the first inspection occurred on March 10, 2009. *See* Plaintiff's App. at 64. In his first report, Weaver states that Jim Joyce "of American Honda" was present. *See* Defendant's App. at 140. In his supplemental report, Weaver states that Jim Joyce "of McLarens Young" was present, along with Chris Christensen "of Honda North America, Inc." *See* Plaintiff's App. at 64.

[101] In his initial report, Weaver stated that the motorcycle was test driven by Mr. Joyce, and that Joyce "stated that the clutch was slipping and that the motorcycle would need to be dismantled to determine the cause of slippage." *See* Defendant's App. at 141. In his supplemental report, however, Weaver states that the motorcycle was test driven by Mr. Christensen, and that Christensen "concurred that the next step would be to disassemble and inspect the clutch."*See* Plaintiff's App. at 66.

[102] *See* Supplemental Report of James Weaver, Plaintiff's App. at 67.

sufficient to render an opinion on the allegedly defective clutch. In determining what weight to give Weaver's expert testimony, the jury may weigh the thoroughness of his investigation and the sufficiency of the evidence upon which he bases his opinions.

Next, the Court must determine whether Weaver's testimony is "the product of reliable principles and methods." Honda complains that there was "no testing" and "no peer review." Given the facts of this case and the nature of the expert testimony, the experts' opinions do not lend themselves easily to testing or peer review. The Court in *Kumho* recognized that the factors identified in *Daubert* may not readily apply in other cases.

> [A] trial court *may* consider one or more of the specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.

*Kumho*, 526 U.S. at 141.

The motorcycle was road-tested by Weaver, Buse, Joyce, and/or Christensen. According to Weaver, all of the test drivers concluded that the clutch was malfunctioning. The disassembly of the clutch was actually performed by Honda's expert. Apparently, the clutch was found to be defective at that time. As the Court understands it, the fighting issue is whether the clutch was defective when the motorcycle was delivered to Boddicker, or whether the damage occurred later.

It is undisputed that Weaver was retained by Boddicker to render an expert opinion in this case, and his opinions regarding the allegedly defective clutch were developed for this litigation. Obviously, however, an expert is not disqualified from testifying simply because his opinions were developed after being retained by a plaintiff. The jury may consider that fact, along with all other evidence, in deciding whether Weaver should be believed. Furthermore, when developing an opinion in this case, and in eliminating alternative causes for the accident, Weaver may accept Boddicker's description of the

accident.  If a jury concludes that the description is not accurate, then it may also consider whether those inaccuracies affect the validity of Weaver's opinions.  Given the nature of the expert testimony in this case, the Court concludes that Weaver's testimony "is the product of reliable principles and methods."  Similarly, the Court concludes that Weaver applied the principles and methods reliably to the facts of this case.

Rule 702 was amended in response to *Daubert* and its progeny.  FED. R. EVID. 702 advisory committee's note.  *Daubert* and Rule 702 provide the Court "with the discretion necessary to close the courtroom door to 'junk science' and to admit reliable expert testimony that will aid the trier of fact."  *Robinson v. Geico General Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006).  "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."  *Id.* (quoting FED. R. EVID. 702 advisory committee's note).

> Rule 702 does not permit a judge to weigh conflicting expert testimony, admit the testimony that he or she personally believes, and exclude the testimony that he or she does not personally believe.  Nor does Rule 702 permit a jury to exclude expert testimony just because it seems doubtful or tenuous.  The Supreme Court has been clear about how infirmities in expert testimony should be exposed: "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786.

*Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

For the reasons set forth above, the Court concludes that Weaver's testimony minimally meets the requirements of Rule 702 and *Daubert*.  Defendant will, undoubtedly,

challenge Weaver's testimony at trial for all of those reasons identified in its brief. The jury must decide how much weight, if any, it will afford Weaver's opinions. Accordingly, the motion *in limine* will be denied.

### B.  Motion for Summary Judgment

In its second motion, Honda asks that Boddicker's complaint be summarily dismissed.

### 1.    Relevant Facts

A review of Honda's statement of undisputed material facts, together with Boddicker's response, establishes the following facts as undisputed:

On October 11, 2008, Boddicker was riding her Honda motorcycle on US Highway 18 within the city limits of Marquette, Iowa. Boddicker lost control as she entered a gentle right-hand curve with a 55 mph speed limit, crossing the centerline and clipping the rear quarter panel of an oncoming vehicle. She came to rest in the ditch approximately 60 feet from the pavement.

Boddicker purchased a new Honda 750 in July 2007. Her first experience operating a motorcycle came when she took a rider training course in August 2007, where she rode a 250 or 350 Honda for her training. Boddicker had put only 1,400 miles on the motorcycle before she crashed. Boddicker was 56 years old when she took the training course and 57 at the time of the crash.

At her deposition, Boddicker was unsure how many gears the motorcycle had and, at one point, testified that it had a "reverse" gear. In fact, the motorcycle has five forward gears, and has no reverse gear.

Boddicker had difficulty with her motorcycle stalling when she was letting the clutch out, trying to leave from a stop. Although this difficulty happened "a lot," Boddicker never reported the problem to the dealer. Boddicker "thought a lot of it was due to her being a newer motorcycle operator." Boddicker understood that she was often not getting

21

the motorcycle into the correct gear at stop lights and stop signs. Boddicker also had problems downshifting the motorcycle.

Earlier on the day of the accident, Boddicker lost control of her motorcycle on a different curve and went off the road in a different place. On the earlier occasion, the road was curving to the left, while at the time of the crash it was curving to the right.

Boddicker was not wearing a helmet and suffered a head injury when she crashed. Boddicker remembers traveling about 40 or 45 mph going into the right-hand curve where she crashed, but does not remember what happened once she entered the curve. According to Boddicker, "I downshifted, my last memory was going into the curve and that was it." Boddicker testified that she downshifted in order to slow her down.

Christopher Heer, who was traveling behind Boddicker, told police that Boddicker "looked like she wasn't leaning into the corner." Kenyon Brody, who was driving the vehicle that was hit by Boddicker when she crossed the centerline, told police that he saw Boddicker's motorcycle "wobble – she stuck her leg out – she shot into our lane." At his deposition, Brody testified that Boddicker "jerked" her leg and was "looking down in the area of her left foot." Brody opined that "it looked like she was trying to get her foot loose or something to me."

James Hofland was married to Boddicker in the late 1970s and early 1980s, and although Boddicker and Hofland were divorced, they were dating each other again at the time of the accident. Hofland is an experienced motorcyclist who has ridden motorcycles since the 1960s. Boddicker developed her interest in learning to ride motorcycles by riding as a passenger with Hofland. Hofland accompanied Boddicker when she picked out the motorcycle, and he rode it when it was new. Hofland did not notice anything "wrong or not working right" when he rode Boddicker's motorcycle, although the ride was only around the block with a top speed of 30 mph.

Hofland testified that he went on rides with Boddicker in 2008 before the accident, and Boddicker mentioned "having trouble finding the gears." On the day of the accident,

Boddicker and Hofland wanted to look at leaves and had no specific destination. Hofland rode ahead of Boddicker on his own Honda motorcycle. The speed limit where the accident happened was 55 mph, and the curve where the crash occurred was not one for which Hofland would slow down by downshifting.

Hofland did not see the accident and does not know what Boddicker did or did not do to control her motorcycle. After the accident, Boddicker told Hofland that "when she had been going into other corners, that when she went to shift, she didn't think she was in the next gear, up or down." When explaining the earlier incident to Hofland, where she went off the road and into somebody's yard, Boddicker said she "couldn't find the gears." Hofland testified that he warned Boddicker "not to look down to see what her foot is doing."

Hofland purchased the wrecked motorcycle from Boddicker after the accident because he wanted to fix it up. After removing broken parts and straightening other parts, Hofland took the motorcycle for a ride "to see how it handled," and found that the clutch was slipping. Hofland adjusted the clutch, but found that it still slipped.

### 2.   *Legal Standard to be Applied*

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications,*

*Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)).   Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'"   *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party.").   "'Evidence, not contentions, avoids summary judgment.'"   *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences.   *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

### 3.    *Analysis*

Boddicker claims that Honda is strictly liable as a consequence of the clutch being defectively manufactured (Count I), and that Honda is liable for breach of implied warranties (Count II).   In seeking summary judgment, Honda argues that Boddicker cannot prove that the clutch was defective when the motorcycle was sold, and cannot prove that the alleged defect caused the accident and Boddicker's resulting injuries.   In addition, Honda argues that the breach of warranty claims are duplicative of the manufacturing defect claim and should be dismissed.

### a.    *Is There a Genuine Issue Regarding Whether the Clutch was Defectively Manufactured?*

As discussed in greater detail above, Boddicker had difficulty shifting the motorcycle from the outset.   While Honda attributes this problem to an inexperienced driver, an inspection of the clutch following the accident revealed that it had been "adjusted considerably tighter, approximately 5 revolutions, likely causing the clutch to

slip."[103]   When the clutch was disassembled during a second inspection, Honda's expert described the clutch as "being burned up."[104]   Honda concedes that the clutch is now damaged, but argues that "[a] properly adjusted clutch could have quickly gone out of adjustment."[105]   Boddicker's expert opined that "[t]he motorcycle most likely was sold to Ms. Boddicker with the clutch improperly adjusted."   Honda's expert conceded that inappropriate adjustment of the clutch cable could be a "potential cause" of the burned clutch.

It is undisputed that the clutch was heavily worn and in need of replacement when it was disassembled following the accident.   Mr. Weaver will testify that the clutch system's extreme wear and tear after only 1400 miles was likely the result of the clutch being improperly adjusted during manufacture.   Mr. Buse will opine that the excessive wear and resulting clutch slippage was likely caused by starting in an improper gear, riding the clutch, or similar operator error.   When viewing the evidence in the light most favorable to Boddicker, the Court concludes that there is a genuine issue regarding whether the motorcycle was sold with a manufacturing defect.   *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092, 1095 (8th Cir. 2007) ("A manufacturing defect is a departure from a product unit's design specifications.").

### b.   Is There a Genuine Issue Regarding Whether the Alleged Defect was a Proximate Cause of the Accident?

Next, Honda argues that even if the clutch assembly was defective, the accident was caused by Boddicker's inattentiveness or other operator error.   Proximate cause is generally an issue for the jury under Iowa law.   *Banks v. Harley-Davidson, Inc.*, 73 F.3d 213, 215 (8th Cir. 1996).   When a plaintiff seeks to prove proximate cause by "circumstantial evidence," then the evidence "must be sufficient to make plaintiffs' theory

---

[103] *See* Boddicker's Statement of Additional Material Facts (docket number 38-3), ¶ 26.

[104] *Id.*, ¶ 38.

[105] *See* Honda's Memorandum (docket number 33-1) at 15.

asserted reasonably probable, not merely possible, and more probable than any other theory based on such evidence." *Id.* (quoting *Oak Leaf Country Club, Inc. v. Wilson*, 257 N.W.2d 739, 746 (Iowa 1977)).

Similarly, in *O'Dell v. Ford Motor Co.*, 2008 WL 2880384 *9 (S.D. Iowa), the Court notes that to survive summary judgment, "the inferences must be reasonably supported by the evidence; sheer speculation is insufficient, and the inference of causation must outweigh contrary inferences," citing *Kleve v. General Motors Corp.*, 210 N.W.2d 568, 571 (Iowa 1973). The Court in *Kleve* noted, however, that it is generally for the jury to determine whether this test has been met.

> An issue may be proven by circumstantial evidence; but this evidence must be such as to make the theory of causation reasonably probable, not merely possible, and more probable than any other theory based on such evidence. **Generally, however, it will be for the jury or other trier of the facts to say whether circumstantial evidence meets this test.**

*Kleve*, 210 N.W.2d at 571-72 (quoting former *Iowa R.Civ.P.* 344(f)(16)) (emphasis added).

When viewing the evidence in the light most favorable to Boddicker, the Court concludes that there is a genuine issue regarding whether the accident was caused by a defect in the clutch assembly, or whether it was caused by operator error. This disputed fact must be resolved by the jury. *Thompson v. Kaczinski*, 774 N.W.2d 829, 836 (Iowa 2009) ("Causation is a question for the jury, *'save in very exceptional cases* where the facts are so clear and undisputed, and the relation of cause and effect so apparent to every candid mind, that but one conclusion may be fairly drawn therefrom.'") (quoting *Lindquist v. Des Moines Union Ry.*, 30 N.W.2d 120, 123 (Iowa 1947)) (emphasis in original). Accordingly, the Court concludes that Honda is not entitled to summary judgment on this ground.

c.     *Are Boddicker's Breach of Warranty Claims Duplicative of Her Manufacturing Defect Claim?*

Finally, Honda argues that Count II of Boddicker's Amended Petition is duplicative of Count I, and must be dismissed.[106] In support of its argument, Honda cites *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092 (8th Cir. 2007), which, in turn, cites *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159 (Iowa 2002).

The Court turns first to the Iowa Supreme Court's opinion in *Wright*. There, the Court responded to certified questions submitted by the District Court for the Northern District of Iowa in a personal injury action filed by a smoker against several cigarette manufacturers. Among other things, the Court discussed the relationship between strict liability claims and alleged breaches of implied warranties. The Court cited with approval its earlier opinion in *Ballard v. Amana Soc'y, Inc.*, 526 N.W.2d 558 (Iowa 1995), in which it concluded that "proof of a 'serious product defect' was sufficient to support submission of strict liability and breach of warranty theories." *Id.* at 181. In *Ballard*, the Court held that "the trial court did not err in submitting both strict-liability and breach-of-warranty theories to the jury." 527 N.W.2d at 562. The Court distinguished its prior holding in *Nelson v. Todd's Ltd.*, 426 N.W.2d 120 (Iowa 1988), where an action seeking economic loss damages only would not support a claim of strict tort liability. *Id.*

> [W]e have found no error in submitting personal injury claims under both strict liability and breach of warrant theories. (citation omitted)  In contrast, where only economic loss is alleged, recovery is limited to warranty claims.

*Wright*, 652 N.W.2d at 182. In other words, the Court has distinguished the theories of recovery "on the basis of the damages sought rather than on the basis of the nature of the wrongful conduct." *Id.*

---

[106] Initially, the Court notes that this complex issue was only superficially briefed by the parties. Honda devoted two paragraphs in its brief, while citing two cases. Boddicker's one-paragraph response consists primarily of a lengthy quote from *Depositors*.

> [A]lthough we have limited cases involving only economic loss to warranty theories, **personal injury plaintiffs are permitted to seek recovery under tort and warranty theories that in essence allege the same wrongful acts**.

*Wright*, 652 N.W.2d at 181 (emphasis added).

The *Wright* Court goes on to state that their position is consistent with the Restatement (Third) of Torts: Product Liability. *Id.* The Court concludes that a "product defect" must be proved "whether the claim is brought under a theory of implied warranty of merchantability or under a tort theory." *Id.* at 181-82. *Wright* does *not* stand for the proposition, however, that a personal injury plaintiff is limited to one theory or the other.

In *Depositors*, a home was damaged in a fire allegedly caused by a faulty lamp and extension cord. After paying the homeowners for the loss, the insurance company brought an action against the manufacturers and retailers of the allegedly defective products. The complaint alleged product liability, breach of an implied warranty of merchantability, and negligence. The district court granted summary judgment for the defendants, and the plaintiffs appealed.

The Eighth Circuit Court of Appeals noted that in order to establish a manufacturing defect, a plaintiff must prove that the product departed from its intended design. The Court concluded that summary judgment was properly granted on the products liability claims because the plaintiffs never offered any evidence regarding (1) the intended design or (2) how the manufacturing of the products departed from the intended designs. 506 F.3d at 1095. Regarding the plaintiffs' implied warranty of merchantability claim, the Court noted that recovery on this theory requires proof of a "product defect," citing *Wright*. "Because the plaintiffs failed to make a showing sufficient to establish a manufacturing defect in either the extension or lamp cords, the district court properly granted summary judgment on the plaintiffs' implied warranty of merchantability claims." *Id.* at 1095-96. In other words, failure to prove a product defect will defeat both a products liability claim and a claim for breach of an implied warranty of merchantability.

After making that conclusion, the Court in *Depositors* states:

> *see also* Restatement (Third) of Torts: Product Liability § 2(a)
> cmt. n (stating a manufacturing defect claim and an implied
> warranty of merchantability claim "rest on the same factual
> predicate" and thus "these two claims are duplicative and may
> not be pursued together in the same case").

*Depositors Ins. Co.*, 506 F.3d at 1095. This observation appears to be *dicta*. There is no indication the defendants claimed the warranty claim was duplicative of the products claim and should be dismissed for that reason.

In its brief, Honda mistakenly attributes the above quoted language to the Iowa Supreme Court in *Wright*. Based on the Court's review, it does not appear that the cited language is found in *Wright* and, in fact, it would appear to be inconsistent with the opinion in *Wright*. Rather, the language is included in the Eighth Circuit's opinion in *Depositors*. Moreover, the language cited above is attributed by the Eighth Circuit to Comment *n* to § 2(a) of the Restatement (Third) of Torts. While Comment *n* discusses the issue, the Court has been unable to locate the language quoted in *Depositors*.

Among other things, Comment *n* addresses the issue of "whether a plaintiff should be permitted to go to the jury on multiple theories for a single defect." The Comment notes the risk of inconsistent verdicts and identifies cases on both sides of the issue. The issue is addressed in some detail by the New York Court of Appeals in *Denny v. Ford Motor Co.*, 662 N.E.2d 730 (N.Y. 1995). While the Comment suggests that there may be good reasons to abandon dual theories on claims for a design defect or failure to warn, it also states that "[i]n a case alleging a manufacturing defect, there is more reason for allowing the case to be presented to the jury on both negligence and strict liability theories." Absent clear Iowa authority on this issue, the Court concludes that in pursuing a claim for personal injuries, a plaintiff may claim both a manufacturing defect and a breach of an implied warranty.

## *V. ORDER*

IT IS THEREFORE ORDERED as follows:

1.      The Motion *in Limine* to Exclude Testimony (docket number 32) filed by the Defendant on July 1, 2011 is **DENIED**.

2.      The Motion for Summary Judgment (docket number 33) filed by the Defendant on July 1, 2011 is **DENIED**.

DATED this _25th_ day of October, 2011.

_____

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA